IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DURAFLAME, INC., | No. CV 12-01205 RS |
| Plaintiff, | **CLAIM CONSTRUCTION ORDER** |
| v. | |
| HEARTHMARK, LLC, dba JARDEN HOME BRANDS, | |
| Defendant. | |

## I. INTRODUCTION

Both plaintiff Duraflame, Inc. ("Duraflame") and defendant Hearthmark, LLC ("Hearthmark") manufacture and sell artificial firelogs for use in home fireplaces. In its Second Amended Complaint, Duraflame alleges Hearthmark has infringed on its patents, violated Section 43(a) of the Lanham Act, engaged in Unfair Competition under the California Business and Professions Code §§17200 *et seq.*, and engaged in False Advertising in violation of the California Business and Professions Code §17500. Focusing on the patent claims, pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), and Patent Local Rule 4-3, the parties have prioritized ten terms found in the

claims of the patents for construction by the Court. In consideration of the briefing, the arguments presented at the *Markman* hearing, and for all the reasons set forth below, the disputed terms are construed as follows.

## II. BACKGROUND

Two artificial firelog patents are asserted by Duraflame. The first patent, U.S. Patent 8,007,550, is entitled "Artificial Firelog Using Non-Petroleum Waxes" ("'550 patent"). This patent is directed at making lower cost, better performing logs which are more environmentally sustainable than firelogs made using fossil-based waxes. The second patent, U.S. Patent 8,123,824, is entitled "Artificial Firelog Using Oil and/or Fat-Retaining Materials" ("'824 patent"). This patent is directed at using non-absorbent, oil retaining materials in order to reduce the amount of more costly wax required.

## III. LEGAL STANDARD

Claim construction is a question of law to be determined by the Court. *Markman*, 52 F.3d at 979. "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillops v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Accordingly, a claim should be construed in a manner that "most naturally aligns with the patent's description of the invention." *Id.*

The first step in claim construction is to consider the claims themselves. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A disputed claim term should be construed in a manner consistent with its "ordinary and customary meaning," which is "the meaning the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13. The ordinary and customary meaning of a claim term may be determined solely by

viewing the term within the context of the claim's overall language. *See id.* at 1314 ([T]he use of a term within the claim provides a firm basis for construing the term.") "When a patentee acts as his own lexicographer in redefining the meaning of particular claim terms away from their ordinary meaning, he must clearly express that intent in the written description." *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005) (citing *Bell Atl. Network Servs. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1268 (Fed.Cir.2001). Additionally, the use of the term in other claims may provide guidance regarding its proper construction. *Id.* ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").

      A claim should also be construed in a manner that is consistent with the patent's specification. *See Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part."). Typically, the specification is the best guide for construing the claims. *See Phillips*, 415 F.3d at 1315 ("The specification is . . . the primary basis for construing the claims"); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (explaining "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). In limited circumstances, the specification may be used to narrow the meaning of a claim term that otherwise would appear to be susceptible to a broader meaning. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001); *Phillips*, 415 F.3d at 1316. Precedent forbids, however, a construction of claim terms that imposes limitations not found in the claims or supported by an unambiguous restriction in the specification or prosecution history. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("[A] court may not import limitations from the written description into the claims."); *Comark Commc'ns., v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("[W]hile . . . claims are to be interpreted in light of the specification, it does not follow that limitations from the specification may be read into the claims."); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) ("It is the *claims* that measure the invention.") (emphasis in original).

A final source of intrinsic evidence is the prosecution record and any statements made by the patentee to the United States Patent and Trademark Office (PTO) regarding the scope of the invention. *See Markman*, 52 F.3d at 980.

Finally, the court may consider extrinsic evidence, such as expert and inventor testimony, dictionaries or technical treatises, especially if such sources are "helpful in determining the 'true meaning of language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting *Markman*, 52 F.3d at 980). Ultimately, while extrinsic evidence may aid the claim construction analysis, it cannot be used to contradict the plain and ordinary meaning of a claim term as defined in the intrinsic record. *Phillips*, 415 F.3d at 1322-23. Once the proper meaning of a term used in a claim has been determined, that term must have the same meaning for all claims in which it appears. *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002).

## IV.    DISCUSSION

| Term | Duraflame's Construction | Hearthmark's Construction |
|---|---|---|
| Artificial Firelog | An elongated, manufactured substitute for natural firewood suitable for burning reasonably intact for approximately 2 to more than 4 hours | Plain and ordinary meaning |

The parties disagree on whether the term "artificial firelog" need be construed. Duraflame contends its addition of the word "elongated" emphasizes the log-like shape of the product. It supports it addition of "burning reasonably intact" with the specification's description of related art requiring "virtually no maintenance," and its proposed addition of "approximately 2 to more than 4 hours" with the description of related art burning for a "known duration, generally from 2 to more than 4 hours." At oral argument, Duraflame further insisted that such construction is necessary to emphasize the contributions the inventors made to the "art" of artificial firelogs. Hearthmark, on the other hand, believes the term need not be construed, as it has been used for years and the jury won't need help understanding its scope.

The term "artificial firelog" need not be construed. "[F]irelog" itself suggests the log-like

1 shape and desired ambiance that Duraflame seeks to emphasize in its proposed construction.
2 Duraflame has put forth no evidence to suggest that one skilled in the art would not understand
3 this term without further clarification. Moreover, it is unnecessary for this single term to carry
4 all information regarding the inventor's contributions to the "art" of artificial firelogs, as
5 Duraflame argues.

| Term | Duraflame's Construction | Hearthmark's Construction |
|---|---|---|
| Combustible non-petroleum wax | Combustible composition made up of one or more biologically based oily, fatty and waxy compounds derived from non-fossil sources | Combustible wax that does not contain any fossil-based materials |

The parties agree that "combustible" need not be construed. Both parties also confirm that "non-petroleum" in this term refers to compounds that are not derived from fossil-based sources. Duraflame's construction seeks to emphasize that the claimed wax can include one or more materials, so long as they are "biologically based." Duraflame seems to suggest that "biologically based" is synonymous with "non-fossil," and inclusion of that term is therefore a further clarification of the types of materials that may comprise the "non-petroleum wax." It notes the specification contains examples of the types of components that may be used, providing intrinsic support for the additional specificity of "oily, fatty, and waxy."

Hearthmark contends its proposed construction is also based on the '550 specification. It argues Duraflame's proposed construction improperly incorporates limitations from the specification that are not present in the claim itself, namely "one or more," "biologically based," "oily, fatty and waxy," and "derived from." Hearthmark further argues that the terms "oil compounds," "fatty compounds," or "waxy compounds" cannot be defined in any meaningful way, adding further confusion to the meaning of the term. At oral argument, Hearthmark also noted that Duraflame's construction transforms the term from being one of exclusion to one of inclusion. This, it insists, is an inappropriate attempt to narrow the scope of the term.

The clarification that the wax may be composed of one or more compounds, and that those compounds need not themselves be waxes, is important. Members of the jury may not

understand that a non-petroleum wax as used in the '550 patent is not just a single solid substance, but rather a variable collection of materials, as one skilled in the art would understand. The inclusion of "oily, fatty and waxy" is not an improper limitation imported from the specification, but rather a necessary clarification of what types of materials may be used to compose the wax. Duraflame's addition of "biologically based," however, is an unnecessary redundancy of "non-fossil," and does nothing to clarify further the components of the wax. If anything, it is a confusing addition, as a jury may not understand that "biologically based" and "non-fossil" are equivalent. Finally, to preserve the spirit of the claim's use of an exclusionary term, Hearthmark's proposed phrase of "that does not contain any fossil-based materials" shall be adopted rather than Duraflame's proposal of a more inclusive term. Accordingly, this term is construed to mean, "combustible composition of one or more oily, fatty and waxy compounds that does not contain any fossil-based materials."

| Term | Duraflame's Construction | Hearthmark's Construction |
|---|---|---|
| Saturated fatty acid material solid at room temperature | All compounds within the combustible non-petroleum wax constituent that are chemically characterized as a fatty acid containing only single carbon-to-carbon bonds and that will not melt below 110 degrees Fahrenheit | Fatty acid containing only single carbon-to-carbon bonds<br><br>Not readily flowable at 70 degrees Fahrenheit |

Duraflame argues this term should be construed as a whole, while Hearthmark contends it should be broken up into two pieces: "saturated fatty acid material" and "solid at room temperature." Hearthmark supports its argument by noting that the terms are used independently from one another throughout the '550 patent. It further states that, because the two terms are clearly divisible, Duraflame's insistence on combining the terms is unjustified. Duraflame responds that "solid at room temperature" must describe the physical characteristics of the thing that the phrase immediately follows, in this case "saturated fatty acid material." While the terms should be construed consistently throughout the claims, Duraflame states, it must be clear that one is a necessary modifier of the other. The Court agrees with Duraflame that "solid at room temperature" acts as a qualifier of the phrase that comes before it, and will thus construe the term

as a whole.

Both parties agree that a "saturated fatty acid" is one that contains only single carbon-to-carbon bonds. This phrase, therefore, need not be discussed further. Duraflame contends that support for its proposed construction is found throughout the specification. It notes the specification explains how the physical properties of certain materials affect the resulting wax's physical properties by making it harder or softer. It points to Tables 1 and 2 of the '550 patent as evidence that the amounts of the different raw material components used is important to the invention. These Tables, it says, support its construction which focuses on chemical characterization in defining the "materials" in the non-petroleum wax component. Hearthmark responds that Duraflame's inclusion of "within the combustible non-petroleum wax constituent" repeats the existing claim language and serves as a confusing limitation for the jury. It further argues that Duraflame's proposed use of the word "all" incorrectly suggests that *all* of the components of the non-petroleum wax constituent must be "solid at room temperature," which is not required by the claims themselves. Duraflame, on the other hand, objects to Hearthmark's proposed construction as reading "material" out of the claim. By including the word "material" in the claims, it posits, the inventors made clear that a "saturated fatty acid material" is more than just a "fatty acid containing only single carbon-to-carbon bonds."

Hearthmark is correct that "within the combustible non-petroleum wax constituent" is redundant in context, as Claim 1 makes clear a non-petroleum wax constituent is contemplated. Thus inclusion of that phrase is unnecessary. Inclusion of "all compounds" however, is necessary to emphasize that the saturated fatty acid material may be composed of one or more different types of fatty acids. Additionally, this phrase is necessary to avoid reading the word "material" out of the claim, as Hearthmark's proposed construction would do.

Duraflame supports its proposed construction of "will not melt below 110 degrees Fahrenheit" by pointing to the specification's discussion of hard waxes and materials generally being "solid at ambient room temperature." It argues that hard materials are also classified as those that have a softening point of greater than 110º F. It therefore concludes that the

specification provides direct support for the use of 110ºF as the cutoff temperature for determining whether a material is solid or not solid at room temperature. Additionally, it contends, the specification suggests that room temperature, for the purposes of the claimed invention, is the temperature of the manufacturing facility. Hearthmark, on the other hand, argues "solid" should be defined as "not readily flowable." It supports this proposed construction by pointing to the prosecution history in which the patentee defined "not solid at room temperature" as "flowable at room temperature." It states that "will not melt" is not synonymous with "solid." It then argues that Duraflame's proposed construction applies an entirely different meaning to "room temperature" than its plain and ordinary meaning and is not defined anywhere in the '550 specification or prosecution history. It disagrees that the specification contemplates defining that term as the temperature of the manufacturing facility. Rather, it contends the court should construe "room temperature" consistent with its plain and ordinary meaning of 70ºF. Hearthmark, however, provides no evidence to support the proposition that the plain and ordinary meaning of "room temperature" is, in fact, 70ºF.

  The term "will not melt" is not synonymous with "solid." The description of "solid" does not immediately suggest looking to the "softening" points of the materials to gleam its definition, and the public is not expected to work to make such connections. Rather, a patent is meant to give clear notice to the public of what is claimed. Here, the words the patentee used when in discussion with the examiner shall be adopted to ensure consistency between what was claimed and how the terms are now construed. Thus "not readily flowable" shall be adopted as the construction for "solid." This construction is further supported by the use of "flowable" in claims 11, 13 and 14 of the patent. While these terms are not asserted against Hearthmark, they may be considered in construing the term at issue. *See Merck & Co., Inc.* 395 F.3d at 1370.

  The specification provides no guidance for the meaning of "room temperature," and neither side provides a definition with adequate intrinsic or extrinsic support. Nevertheless, both sides agree that the term needs to be construed. As no intrinsic evidence is provided, this Court may consider extrinsic evidence in construing the phrase "room temperature." According to the

Oxford U.S. English Dictionary, the phrase is defined as "a comfortable ambient temperature, generally taken as about 70ºF." MacMillan Dictionary defines the phrase to mean "the normal temperature inside a building that is neither too hot nor too cold." The Merriam Webster Medical Dictionary defines the phrase to mean "a temperature of from about 59º to 77º F (15º-25ºC) which is suitable for human occupancy and at which laboratory experiments are usually performed." These definitions all contemplate a temperature within the range to be expected for normal human comfort. The Court will adopt the most simple of the definitions, and define "room temperature" as "about 70 degrees Fahrenheit."

It follows that this term will be construed as a whole, to mean "All fatty acid compounds containing only single carbon-to-carbon bonds that are not readily flowable at about 70 degrees Fahrenheit."

| Term | Duraflame's Construction | Hearthmark's Construction |
| --- | --- | --- |
| Pitch material | All material within the combustible non-petroleum wax constituent that is characterized as the low molecular weight reaction products found in the form of highly viscous liquids obtained from a distillation process | A black or dark viscous substance obtained as a residue from a distillation process |

Duraflame again supports its proposed construction with evidence in the specification. It states that "pitch material" as used in the claims is not the same as any commercially available raw material with "pitch" in its name. It points to Tables 1 and 2 of the '550 patent as evidence that Stearic acid Pitch and Tall Oil Pitch contain materials in them that are not chemically defined as "pitch material." Hearthmark objects to this proposed construction as adding many limitations, such as "all material," "within the combustible non-petroleum wax constituent," "that is characterized as the low molecular weight reaction products," and "in the form of . . . liquids." Hearthmark specifically contends that "low molecular weight reaction products" is obtained from one generic embodiment of "pitch material" and does not define it. Additionally, Hearthmark contends that Duraflame has no support for the proposition that "pitch material"

No. 12-cv-01205 RS
ORDER

1 must be "liquid."

2 Hearthmark supports its proposed construction with evidence from the prosecution history in which Duraflame distinguished its invention from that of the prior art by setting forth definitions of pitch, one of which was "[a]ny of various thick, dark, sticky substances obtained from the distillation residue of coal tar, wood tar, or petroleum and used for waterproofing, roofing, caulking, and paving." Duraflame objects to any reliance on this definition, as it claims it was used only to point out that the prior art did not have anything that could possibly fall within the broad definitions listed by the applicant, and was made in reference to petroleum-based products. Additionally, Duraflame objects to Hearthmark's proposed construction by arguing it fails to provide any analytical boundaries and is contrary to the specification's focus on the chemical profiles of the various components.

Both parties seem to agree that "pitch material" refers to a highly viscous residue obtained from a distillation process. There is no need to add the additional limitations supplied by the parties, as none serves to further elucidate this term. There is no intrinsic evidence to support the proposition that the substance must be "dark," nor is there evidence to suggest the substance must be "liquid." Duraflame's proposed addition of "low molecular weight" does not help to clarify the description of "viscous," but would rather tend to confuse the jury as to the meaning of this relatively common word. Accordingly, this term shall be construed as "a material made of the highly viscous substance obtained as a residue from a distillation process."

| Term | Duraflame's Construction | Hearthmark's Construction |
|---|---|---|
| At least one constituent that is liquid at room temperature | All compounds within the non-petroleum wax constituent that are liquid below 110 degrees Fahrenheit | Plain and ordinary meaning of "at least one constituent"<br><br>Readily flowable at 70 degrees Fahrenheit |

Duraflame first notes that "constituent" is being used differently here than elsewhere in the patent. It states that, to be consistent, the drafters should have chosen to use the word "material" in lieu of "constituent." It argues the term refers to a group of compounds in the non-petroleum wax constituent that are defined by the physical property of being liquid at room

temperature. Hearthmark responds that "at least one constituent" need not be construed. It contends that Duraflame's proposed construction again imports limitations not found within the claims, and adds a confusing redundancy to the claims. Furthermore, it argues, Duraflame's proposed use of the word "all" may confuse the jury to think that *all* of the components of the non-petroleum wax constituent must be "liquid at room temperature."

Duraflame's use of the word "all" is much narrower than the patent's use of "at least one." There is no reason to import such a limitation into the term. Moreover it may serve as a confusing qualifier for the jury. A better indication that the term is meant to encompass materials within the constituent that are liquid is "any." While each party initially construed "liquid," at oral argument, Hearthmark made the persuasive argument that the word need not be construed. Finally the phrase "at room temperature" shall be construed as discussed above to mean "about 70 degrees Fahrenheit." As such, this term shall be construed to mean "any compound that is liquid at about 70 degrees Fahrenheit."

| Term | Duraflame's Construction | Hearthmark's Construction |
|---|---|---|
| "about" when used before percentages | The scope should be adapted to each range of percentages, allowing for 10% relative variation at each end | Plus or minus 1% |

Duraflame first argued "about" should be construed to allow a "minus 5%" variation on the stated low end of a range of percentages, and a "plus 10%" variation on the stated high end of a range, when the stated percentages ended in a multiple of 10. However, if the percentage contained a decimal, Duraflame proposed that "about" should be given a range of "minus .3%." It supported this proposed construction by noting that there is a degree of absolute imprecision in the manufacturing of firelogs. Hearthmark countered that "about" should be construed to mean "plus or minus 1%." It argued Duraflame's proposed construction was unnecessarily complicated and yielded inconsistent results. In response, Duraflame changed its proposed construction such that the scope of the term "about" is adapted to yield a relative variation of 10% on either side of the provided range. This would mean that a range of 40-50% could be extended by 10% on either end to yield a range of 36-55%. At oral argument, Hearthmark

objected to this new construction, as it would nearly double the acceptable percentage range claimed in the patent.

The Federal Circuit has stated that the "word 'about' does not have a universal meaning in patent claims, . . . the meaning depends upon the technological facts of the particular case." *Ortho-McNeil Pharmaceutical, Inc. v. Caraco Pharmaceutical Laboratories, Ltd.*, 476 F.3d 1321, 1326 (Fed. Cir. 2007). In construing the term "about," courts consider how the term is "used in the patent specification, the file history, and the other claims." *Id.* It may consider whether the patentee set forth a definition for "about" with reasonable clarity, deliberateness, and precision. *Merck & Co., Inc. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005). "When a patentee acts as its own lexicographer in redefining the meaning of particular claim terms away from their ordinary meaning, he must clearly express that intent in the written description." *Id*. (citing *Bell Atl. Network Servs. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001)). When the patentee does not clearly redefine "about" in the specification, however, the term should be given its ordinary and accepted meaning of "approximately." *Id.* at 1372.

In the present case Duraflame has not redefined the meaning of "about" in clear enough terms to justify a new definition of that term. Moreover, there is nothing in the specification to justify putting discrete bounds on the acceptable range. In *Ortho-McNeil*, the court found both intrinsic and extrinsic evidence to support a construction of "about 1:5" to mean "approximately 1:5, encompassing a range of ratios no greater than 1:3.6 to 1:7.1." Here, in contrast, there is nothing in either the specification or the prosecution history to suggest the term should be understood as providing for exactly a relative 10% variation on either side of the provided range, or to limit any variation to 1% above or below the stated range. In the context of the claims, the patentee appears to use "about" to provide for the variation inherent in the manufacturing process.[1] Accordingly the term "about," when used before percentages, should be given its

---

[1] The testimony of Duraflame's own expert, James Houck, while extrinsic evidence and therefore not directly relevant for claim construction purposes, is notable on this issue as he states that the manufacture of firelogs is a necessarily imprecise large-scale process. This fact

ordinary and accepted meaning of "approximately."

| Term | Duraflame's Construction | Hearthmark's Construction |
|---|---|---|
| "about" when used with "100 parts" | such that the total of the percentage amounts of the constituents in the artificial firelog is, within measurement errors and rounding approximations, 100%" | 99-101 parts |

Duraflame states its proposed construction reflects the fact that measurements of the constituents will not be perfect, and may include rounding approximations. Hearthmark insists that "about" should be construed consistently throughout the patent, and that "about 100 parts" should thus be confined to mean "99-100 parts."

In this context, "about" cannot be given a rigid definition, as Hearthmark proposes. Its use is meant to indicate that measurement errors may occur such that the list of components comprising the final constituent may not add up exactly to 100. Duraflame's proposed construction better captures that intention and shall be adopted.

| Term | Duraflame's Construction | Hearthmark's Construction |
|---|---|---|
| At least one combustible material selected from the group consisting of ground oil-retaining and fat-retaining material, said group not including coffee grounds | Combustible oil and fat retaining material ground to a suitable particle size that does not contain coffee grounds and which does not absorb as much oil as softwood sawdust | Plain and ordinary meaning |

This term appears only in the '824 patent. Duraflame insists its proposed construction elucidates the essential characteristics of the constituent and clarifies that it is distinct from the "combustible cellulosic material" constituent that is also claimed in the invention. Hearthmark argues the term need not be construed. It states the limitation is a "Markush group" and therefore its scope is closed. It argues Duraflame's proposed construction improperly attempts to broaden the scope of the limitation, and the addition of "ground to suitable particle size" is an improper importation from the specification. Moreover, Hearthmark contends that "suitable" is

---

would be ignored by construing the term "about" to contain hard boundaries on either end of the provided range.

1 itself indefinite. Duraflame, however, insists that it is only construing the meaning of the
2 Markush group member, not trying to read the limitations out of the claims. If necessary, it
3 suggests the Court consider the term to be specially defined and therefore an exception to the
4 application of a plain and ordinary meaning.

5 No clear evidence supports the contention that the patentee acted as its own lexicographer
6 when choosing to use this term. Thus, it must be construed as one skilled in the art would have
7 understood it at the time the patent was filed. The phrase "at least one combustible material" is
8 self-explanatory. Duraflame's proposal is redundant, and adds nothing, to an understanding of
9 the term. Thus, this phrase need not be construed. Additionally, "said group not containing
10 coffee grounds" is a self-defining phrase similarly in no need of construction.

11 Duraflame's proposed addition of "which does not absorb as much oil as softwood
12 sawdust" is an improper limitation imported from the specification that cannot be sustained. The
13 claims themselves do not contemplate any comparison of the absorption of the constituent at
14 issue to saw dust. However, "reduced to suitable particle size" is a proper clarification of the
15 word "ground." The patent specification makes clear that the size of the particles is crucial to
16 their being able to be combined into a log. Without this additional explanation, the term
17 "ground" does not indicate that the size of the grind is deliberate or material to the end product.
18 Such explanation is not an improper expansion of the scope of the Markush group as, if anything,
19 it serves to narrow the term. Accordingly, only the meaning of "ground" need be construed. It
20 shall be defined to mean "reduced to suitable particle size." Thus, this term shall be construed as
21 "At least one combustible material selected from the group consisting of oil-retaining and fat-
22 retaining material reduced to suitable particle, said group not including coffee grounds"

### V. CONCLUSION

24 The disputed claim terms of the patents-in-suit are hereby construed as set forth above. A
25 case management conference shall be scheduled in this matter for Thursday, March 21, 2013 at
26 10:00 a.m.

IT IS SO ORDERED.

Dated: 2/14/13

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE